IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Carolyn M., ) | |
| ) | |
|     Plaintiff, ) | |
| ) | Case No.: 20-cv-50404 |
|   v. ) | |
| ) | Magistrate Judge Margaret J. Schneider |
| Martin O'Malley, ) | |
| Commissioner of Social Security,[1] ) | |
| ) | |
|     Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff seeks review of the final decision of the Commissioner of the Social Security Administration denying her disability benefits. The parties have filed cross motions for summary judgment [18], [23]. For the reasons set forth below, Plaintiff's motion for summary judgment [18] is denied and the Commissioner's motion for summary judgment [23] is granted. The final decision of the Commissioner denying benefits is affirmed.

## BACKGROUND

### A. Procedural History

On July 27, 2015, Plaintiff filed for disability insurance benefits. [18], p. 1. She alleged a disability beginning on July 27, 2015. *Id.* The Social Security Administration ("Commissioner") denied her application on October 9, 2015, and upon reconsideration on January 23, 2016. *Id.* On December 16, 2016, a hearing was held by Administrative Law Judge ("ALJ") Kevin Plunkett where Plaintiff appeared and testified. *Id.* Thereafter, on May 30, 2017, the ALJ denied Plaintiff's claims. *Id.* After the Appeals Court denied review, Plaintiff appealed to the U.S. District Court for the Northern District of Illinois. [18], p. 2. The District Court remanded the case for a second hearing in front of ALJ Jessica Inouye which occurred on May 7, 2020. *Id.* Plaintiff was represented by counsel and appeared virtually. R. 1876. Tobey Andre, an impartial vocational expert ("VE"), also appeared and testified, as well as impartial medical expert Howard S. Shapiro, M.D. *Id.*

On June 24, 2020, the ALJ issued her written opinion denying Plaintiff's claims for disability, disability insurance benefits, and supplemental security income. R. 1876-1899. Plaintiff "bypassed the Appeals Council making the ALJ's decision the Commissioner's final decision for purposes of judicial review." [18], p. 2. Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *See* 20 C.F.R. 416.1484(d). Now before the Court are Plaintiff's motion for summary judgment [18], the Commissioner's cross-motion for

---

[1] Martin O'Malley has been substituted for Andrew Saul. Fed. R. Civ. P. 25(d).

summary judgment and response to Plaintiff's motion for summary judgment [23], and Plaintiff's reply brief [24].

### B. The ALJ's Decision

In her ruling, the ALJ applied the statutorily required five-step analysis to determine whether Plaintiff was disabled under the Social Security Act. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Plaintiff had not been engaging in substantial gainful activity since the alleged onset date of July 27, 2015. R. 1880. At step two, the ALJ found that Plaintiff had the following severe impairments: asthma/COPD, degenerative disc disease, sphincter of Oddi, and inflammatory bowel syndrome (IBS). *Id*. The ALJ found that these impairments significantly limited Plaintiff's ability to perform basic work activities. *Id*. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 1885.

Before step four, the ALJ found that Plaintiff had a residual functional capacity ("RFC") to perform light work but with the following limitations: no climbing ladders, ropes or scaffolds but occasional climbing of ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; work in indoor, temperature-controlled environments without concentrated exposure to extremes in temperature or pulmonary irritants (including unusual amounts of dust, ash soot, sawdust). R. 1887. At step four, the ALJ found that Plaintiff has no past relevant work. R. 1897. Finally, at step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including mail clerk (DOT# 209.687-026), storage facility rental clerk (DOT# 295.367-026), and laundry sorter (DOT# 361.687-014). R. 1898. Therefore, the ALJ concluded that Plaintiff was not disabled under the Social Security Act at any time from July 27, 2015, through May 16, 2019; as of May 16, 2019 the Plaintiff became disabled because her age category changed. R. 1899.

## STANDARD OF REVIEW

The reviewing court evaluates the ALJ's determination to establish whether it is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal citations omitted). Substantial evidence is "more than a mere scintilla." *Wright v. Kijakazi*, No. 20-2715, 2021 WL 3832347, at *5 (7th Cir. 2021). "Whatever the meaning of 'substantial' in other contexts, the Supreme Court has emphasized, 'the threshold for such evidentiary sufficiency is not high.'" *Id*. (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1153 (2019)). As such, the reviewing court takes a limited role and cannot displace the decision by reconsidering facts or evidence or by making independent credibility determinations, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008), and "confines its review to the reasons offered by the ALJ." *Green v. Astrue*, No. 11 CV 8907, 2013 WL 709642, at *7 (N.D. Ill. Feb. 27, 2013).

The court will only reverse the decision of the ALJ "if the record compels a contrary result." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021) (citations and quotations omitted). The court is obligated to "review the entire record, but [the court does] not replace the ALJ's judgment

with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. [The court's] review is limited also to the ALJ's rationales; [the court does] not uphold an ALJ's decision by giving it different ground to stand upon." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020); *see also Warnell v. O'Malley*, 97 F.4th 1050, 1052-53 (7th Cir. 2024) ("When reviewing a disability decision for substantial evidence, '[w]e will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence support it.'"). Additionally, an ALJ "need not specifically address every piece of evidence, but must provide a logical bridge between the evidence and his conclusions." *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023) (citations and quotations omitted). *See also Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

## DISCUSSION

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. Specifically, Plaintiff contests the ALJ's consideration of the medical expert's testimony, and makes several arguments related to the VE's testimony and Plaintiff's related post-hearing objections. [18]. Each argument will be taken in turn.

### A. ALJ's Consideration of the Medical Expert

Plaintiff contends that the ALJ erred in her assessment of the medical expert's testimony, and specifically takes issue with the ALJ's assessment of the medical expert's testimony on Plaintiff's likely absences from work. [18], p. 3-5. The medical expert, Dr. Shapiro, testified at the hearing that he thought Plaintiff would miss work "at least four times a month." R. 1979. The ALJ gave that portion of Dr. Shapiro's opinion "little weight" because "[n]ot only did the medical expert actually not explain wh[y] she would be absent due to her medically determinable impairment, [the medical expert] could not specify which, if any, medically determinable impairments actually caused the limitations." R. 1896. The ALJ therefore concluded that Dr. Shapiro's estimation of Plaintiff's likely number of absences was based "[m]erely [on] the *number* of visits [to the emergency department] and not the *medical necessity* for those visits." *Id.* (emphasis added). Plaintiff contends that this evaluation of Dr. Shapiro's absence testimony was made in error because the ALJ "failed to build an accurate and logical bridge from the evidence to [her] conclusion." [18], p. 4.

The ALJ did not err in her evaluation of Dr. Shapiro's opinion. The ALJ did, in fact, build a logical bridge from her evaluation of the evidence to her conclusion, explaining that she rejected this portion of Dr. Shapiro's testimony because he could not explain the medical necessity for the visits or even identify any medically determinable impairments that would cause limitations such as absences. R. 1896. "[M]edical opinions upon which an ALJ should rely need to be based upon objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Zblewski v. Astrue*, 302 F. App'x 488, 493 (7th Cir. 2008) (quoting *Rice v. Barnhart*, 384 F.3d 363, 370–71 (7th Cir.2004)). The ALJ accurately noted that Dr. Shapiro's testimony provided no objective observations as a basis for his estimation of Plaintiff's likely absences. Instead, he appeared to merely recite the Plaintiff's subjective complaints. For example, he stated that while he could not provide an objective medical explanation for Plaintiff's alleged symptoms, based on the medical record and the fact that "when one appears in the emergency room, it usually

involves pain or some other problem which is more than a couple of hours old," he believed that Plaintiff's "medical care would have entailed more than four hours and four days absence from work." R. 1980. The ALJ therefore properly gave little weight to Dr. Shapiro's opinion as to the likelihood of absences because it was not grounded in any objective observations whatsoever.

Moreover, the ALJ correctly discounted Dr. Shapiro's opinion as to likely absences because his estimation of absences appeared to be based solely on Plaintiff's bare assertions of "medical care" or appointments. *Id*. The Seventh Circuit has rejected as "frivolous" the argument of work-preclusive absenteeism based on an unelaborated need to attend medical appointments. *Best v. Berryhill*, 730 Fed. Appx. 380 (7th Cir. 2018) (rejecting the argument that medical appointments would cause work-preclusive absenteeism where the Plaintiff "[h]as not shown that [the appointments] would preclude him from working… [Plaintiff] cannot point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours."). Other courts have subsequently followed suit, rejecting arguments and opinions as to work-preclusive absenteeism that are based on bare assertions of medical appointment needs. *See Paul M. v. Saul*, No. 19 CV 4581, 2021 WL 794981, at *6 (N.D. Ill. Mar. 2, 2021).; *Chestine G. v. Saul*, No. 18 C 4980, 2020 WL 1157384, at *9 (N.D. Ill. Mar. 10, 2020) (finding that the ALJ "properly gave little weight" to a medical expert's opinion that the Plaintiff would need to miss more than four days per month to attend medical appointments). Accordingly, the ALJ here "properly gave little weight" to the opinion of Dr. Shapiro as to Plaintiff's likely absences. The ALJ therefore supported her decision with substantial evidence and the Court finds no error with the ALJ's evaluation of Dr. Shapiro's opinion.

**B. VE's Methodology**

Plaintiff contests the ALJ's reliance on the VE's job number estimations, arguing that the VE inadequately explained her methodology in arriving at the job number figures. [18], p. 7-15. The Court finds that the VE's explanation as to her job number methodology was the product of a reliable method and that the ALJ's reliance on the VE's job suggestions was appropriate.

"With respect to a vocational expert's testimony about job prevalence, the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method. Thus, the expert's explanation of the methodology that he used to produce his estimate must be reasoned and principled enough to instill some confidence that the estimate was not conjured out of whole cloth." *Case v. Kijakazi*, No. 22-2379, 2023 WL 4882880, at *3 (7th Cir. Aug. 1, 2023) (internal quotations and citations omitted). The Supreme Court has further elaborated on the degree of explanation required by the VE, asserting that the inquiry as to the substantiality of the evidence in such instances is "case-by-case" and "[d]efers to the presiding ALJ, who has seen the hearing up close." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1156–57, 203 L. Ed. 2d 504 (2019). Ultimately, "[e]ven without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion about whether an applicant could find work." *Biestek*, 139 S. Ct. at 1156–57.

Upon questioning by the Plaintiff as to the methodology used to generate job number estimates, the VE explained that "she did not use personal experience for job numbers but used

[SkillTRAN's] Job Browser Pro, who uses labor market surveys… she testified that this program uses an algorithm from a number of job sources published by the Bureau of Labor Statistics" and that she "used the total distribution"[2] method, considering "full-time only jobs." R. 1898 (citing R. 1994-2000). The VE also affirmed that she last checked for updates on job numbers in March of 2020, and that the DOT updates some job numbers more than others. R. 1994-2000. The VE further explained that the numbers generated through SkillTRAN are "representative" and "are not specific to the DOT code," and that while she uses O*NET on occasion, she had not used it in this case. *Id*. The VE therefore demonstrated "[t]hat the methodology that [she] used to produce [her] estimate [was] reasoned and principled" by explaining that she used SkillTRAN's Job Browser Pro, the total distribution method of formulation, considered only full-time jobs, and further explained that Job Browser Pro utilizes an algorithm that pulls data from Bureau of Labor Statistics publications. *Case*, 2023 WL 4882880 at *3.

Despite this reasoned and principled explanation of her methodology, Plaintiff argues that the VE was unable to "[d]escribe or name her method in the testimony." [18], p. 8. As detailed above, the VE did describe and name her method; she testified that she used SkillTRAN and the total distribution method of formulation to pull full-time only jobs. She also responded to specific questions as to SkillTRAN's functionality: upon being asked how SkillTRAN calculates its job numbers, the VE explained that SkillTRAN "[h]as an algorithm, and they seek their numbers from various sources published by the United States Bureau of Labor Statistics…including, but not limited to, an annual employer survey." R. 1995. When asked "[h]ow many DOT codes are there in each of these SOC[3] or OES groups that SkillTRAN's got," the VE attempted to answer, explaining that it "depends on how many OES…" when Plaintiff's counsel cut her off. *Id*. Similarly, when asked how many DOT codes are within the SOC group for the position of hospital cleaner, the VE explained that she would need to use the SkillTRAN software to look it up and attempted to do so, but was directed towards a new question by Plaintiff's counsel instead. R. 1996. The VE affirmed that SkillTRAN gives "[r]epresentative numbers of the SOC code," that the SOC code does not differentiate among skill levels, and corrected Plaintiff's counsel when he asserted that SkillTRAN relies on privately sourced information, reasserting that SkillTRAN uses publications from the Buruea of Labor Statistics. R. 1997. The VE thus gave reasoned and

---

[2] Plaintiff makes a lengthy argument as to the impropriety of the VE's use of the "equal distribution method." [18], p. 12-13. This argument ignores the VE's testimony on this issue; Plaintiff explicitly asked the VE if she used the equal distribution method on SkillTRAN, and the VE affirmed that she "used the total distribution, full-time only jobs." R. 1995. At no other point in her testimony did the VE assert that she used the equal distribution method. Indeed, SkillTRAN itself asserts that its software "uses a method of estimating job numbers for a particular DOT code using data from the Department of Labor's Occupational Employment Survey (OES) that avoids the flaws of oft-criticized equal distribution method." *Wegerer v. Kijakazi*, No. 22-CV-123-JDP, 2023 WL 6307407, at *4 (W.D. Wis. Sept. 28, 2023). The Court therefore will not consider any arguments as to the impropriety of the equal distribution method, as there is no basis for concluding that such a method was employed in this case on the record before the Court.

[3] The OES, or Occupational Employment Survey, is a publication of the United States Bureau of Labor Statistics which organizes its job estimations by SOC, or standard occupational classification. *See Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022). "SOC codes sort jobs into broad occupational categories, such as mathematicians (SOC 15-2021) or electrical engineers (SOC 17-2071), that each encompass multiple DOT job titles," which is why VEs often employ the use of an additional source—here, SkillTRAN—to match up DOT titles to SOC codes. *Id*.

principled answers to the extent possible; any shortcomings in the VE's further explanation of SkillTRAN's functionality or her use of SkillTRAN appear to be the product of Plaintiff's own questioning, which often cut off or cut short the VE's explanations.

Moreover, the "[i]nability of the vocational expert to precisely explain the [SkillTRAN] software's algorithms does not render his explanation unreliable." *Case*, 2023 WL 4882880 at *3. The VE here generally explained that SkillTRAN's software uses data from Bureau of Labor Statistics publications and explained that, with SkillTRAN, she would be able to determine specifics such as how many DOT codes are within an SOC code. She was not required to explain the functionality of SkillTRAN's algorithm any further. Accordingly, "[t]hough the VE's description did not reveal the precise mechanics and statistical model involved, it nevertheless constitutes a reasoned and principled explanation, at least by the low substantial evidence standard." *Bruno v. Saul*, 817 F. App'x 238, 243 (7th Cir. 2020).

Additionally, even if the VE's methodology testimony was insufficient to reach the low substantial evidence standard, any error that resulted would be harmless because the ALJ explained at Step 5 that "[i]t is important to acknowledge that the combination of exertional and nonexertional limitations in the claimant's assessed residual functional capacity do not significantly erode the unskilled light occupation base." R. 1898. In other words, even if the VE erred in her testimony, the ALJ still considered and found that significant numbers of jobs exist in the national economy because the social security "rulings alone would support rather minimal erosion of the unskilled light occupation base, even without specific examples from a vocational expert." *Id*. Specifically, the ALJ cited to Social Security Ruling 85-15 as to the occasional stooping exertional limitation in the RFC, which provides that "[i]f a person can stoop occasionally…the sedentary and light occupational base is virtually intact." *Id*. Similarly, the ALJ quoted the same ruling's articulations as to occasional crawling, crouching, and kneeling, which explain that such limitations "[w]ould be of little significance in the broad world of work" because they are relatively rare activities. *Id*. As for the non-exertional limitations in the RFC, the ALJ pointed to the same ruling, which explains that for a "[m]edical restriction to avoid excessive amounts of noise, dust, etc. the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." *Id*. Accordingly, the ALJ supported her finding that significant jobs exist in the national economy with substantial evidence by building a logical bridge from the minimal erosion of the work base created by the relatively limited RFC. Thus, even if the VE's methodology explanation was made in error, it was harmless.

### C. Cross-Examination of the VE

Plaintiff argues that the ALJ improperly terminated her cross-examination of the VE and that such termination requires remand. [18], p. 5-6. Plaintiff states that, had she continued her cross-examination, she would have elicited the "VE's confirmation that the SVP levels of the jobs she testified to were compatible with the O*NET's SVP rating, not the DOT's." [18], p. 5.

The HALLEX, a set of "[g]uiding principles, procedural guidance and information" that also "defines procedures for carrying out policy and provides guidance for processing and adjudicating claims," provides that "[t]he claimant and any representative have the right to question the vocational expert fully on any pertinent matter within the vocational expert's area of expertise, however the ALJ will determine when they may exercise this right and whether

questions asked or answers given are appropriate." *Teresa G. S. v. Comm'r of Soc. Sec.*, No. 19-CV-583-DGW, 2020 WL 230706, at *3 (S.D. Ill. Jan. 15, 2020); HALLEX I-2-6-74C. Courts have recognized that "[a]lthough the HALLEX does not carry the authority of law, it deserves weight." *Teresa G. S.,* 2020 WL at *3.

Here, the ALJ exercised her discretion to determine "whether questions asked or answers given are appropriate" by terminating the continued questioning of the VE's job-number methodology. R. 1998-2000. As explained in Section B of this opinion, the VE provided a reasoned and principled explanation of her methodology; she explained that she used SkillTRAN's Job Browser Pro, and she responded adequately to specific questions about SkillTRAN's functionality. As the VE had adequately explained her methodology, the ALJ appropriately exercised her discretion in terminating further unnecessary questioning due to "timing-constraints caused by the Covid-19 situation." R. 1876.

Moreover, any error that resulted from the ALJ's conclusion of the VE's cross-examination is harmless because the VE at base appropriately explained her methodology, and Plaintiff only contends that further questioning would have demonstrated that the VE testified to job levels compatible with the O*NET rather than the DOT. [18], p. 5. A VE may properly use data from the O*NET, and "federal regulations do not prohibit an administrative law judge from relying on the O*NET" either. *Milligan v. Kijakazi*, No. 1:20-CV-266-JPK, 2022 WL 909644, at *4 (N.D. Ind. Mar. 28, 2022); *Wennersten v. Colvin*, No. 12-CV-783-BBC, 2013 WL 4821474, at *4 (W.D. Wis. Sept. 10, 2013) ("As the administrative law judge pointed out, 20 C.F.R. § 404.1566(d) allowed him to take administrative notice of reliable job information available from various governmental and other publications."). Accordingly, any error that resulted from the ALJ's termination of further VE questioning on job number methodology was harmless because, even if the VE's methodology produced jobs more compatible with the O*NET than the DOT, both the VE and the ALJ were nonetheless allowed to use data from the O*NET.

### D. ALJ's Consideration of Plaintiff's Objections

Plaintiff finally contests the ALJ's consideration of her post-hearing objections, arguing that the ALJ failed to address them. [18], p. 6. This argument fails for several reasons, primarily because the ALJ did, in fact, address Plaintiff's objections. *See* R. 1876-78. Moreover, contrary to Plaintiff's assertion, post-hearing challenges are not an "entitlement" requiring response by the ALJ; instead, "[w]hile the Seventh Circuit stated it encourages ALJs to allow claimants to submit post-hearing argument, the court specifically stated [it has] never mandated that post-hearing challenges be allowed." *Tipsord v. Kijakazi*, No. 21-cv-03018, 2023 WL 6276489, at *8 (C.D. Ill. Sep. 26, 2023). The ALJ therefore did not even have to entertain any post-hearing argument, and the Court finds no error in the ALJ's resolution of Plaintiff's post-hearing objections.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [18] is denied and the Commissioner's motion for summary judgment [23] is granted. The final decision of the Commissioner denying benefits is affirmed.

Date: 05/31/2024                              ENTER:

_____
United States Magistrate Judge